**Marlys HANSEN and Tom Hansen, Appellants,**

v.

**CENTRAL IOWA HOSPITAL CORPORATION, d/b/a Iowa Methodist Medical Center, Appellee.**

No. 03–0626.

Supreme Court of Iowa.

Sept. 1, 2004.

Rehearing Denied Sept. 21, 2004.

Jerry Crawford and Jim Quilty, Des Moines, for appellants.

Thomas A. Finley, Connie Diekema, and Tamara K. Hackmann of Finley, Alt,

Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellee.

LAVORATO, Chief Justice.

In this medical negligence case, Marlys Hansen sued Central Iowa Hospital Corporation, d/b/a Iowa Methodist Medical Center (IMMC), for injuries and damages she allegedly received in a fall while a patient at the hospital. Her husband, Tom Hansen, joined in the suit, claiming loss of consortium. The district court disallowed testimony from Marlys's treating physician because the Hansens did not designate him as an expert pursuant to Iowa Code section 668.11 (2003). A jury found IMMC negligent but denied any damages because it also found that such negligence was not a proximate cause of the fall and the Hansens' damages. The district court thereafter denied the Hansens' motion for new trial. The Hansens appealed, contending the district court abused its discretion in excluding the physician's testimony and in denying their motion for new trial.

We transferred the case to the court of appeals, and that court affirmed. We granted the Hansens' application for further review and now vacate the court of appeals decision and reverse the district court judgment. We remand the case for a new trial.

## I. Background Facts and Proceedings.

On June 1, 1999, Marlys was hospitalized at IMMC because of back pain, a condition of long duration. Because Marlys was unstable on her feet and had a history of falls due to her back condition, IMMC placed her on "fall precautions." "Fall precautions" meant that while Marlys was in the hospital, she should not get up without assistance, her bed side rails should be up, and her call light should be within reach. However, during the night

of June 5, hospital staff placed a commode next to Marlys's bed and told her to use it for her restroom needs throughout the night.

During the night, Marlys tried to go from her bed to the commode. While attempting to get to the commode, Marlys fell because the bed rolled. The wheels on the bed were not locked. When she tried to get up, she fell a second time.

On June 9 Marlys was discharged from the hospital. Once at home, she felt pain that was different from any pain she had previously experienced. The pain did not subside. She reported increased pain to her physical therapist. Her pain became so intolerable that she quit her job.

After the 1999 hospitalization, Marlys fell on other occasions. Some of those falls required her to seek medical treatment.

Dr. Kenneth Pollack, an anesthesiologist specializing in chronic pain problems, surgically implanted a morphine pump into Marlys's back. Even with the morphine pump, Marlys has continued to have pain.

On June 1, 2001, Marlys sued IMMC and Dr. Daniel McGuire, alleging medical negligence resulting in the falls from which Marlys sustained injuries. Marlys's husband, Tom, joined in the suit for loss of consortium. A scheduling order dated October 8 established December 24 as the deadline for plaintiffs to designate expert witnesses.

On December 21 the Hansens filed a designation of experts, naming Jane Fleming, R.N. as an expert who would "be called to testify regarding standard of care, breach and causation." They reserved the right to call additional witnesses. The Hansens also identified an accountant who would be called to testify regarding economic damages.

On December 26 the Hansens moved to extend the time to designate medical experts. On January 31, 2002, the Hansens dismissed Dr. McGuire from the suit without prejudice. On February 1 the Hansens withdrew their motion to extend the time to designate medical experts, citing the dismissal of Dr. McGuire from the case.

On April 19 IMMC filed its designation of expert witnesses. IMMC designated all of Marlys's treating health care providers as potential witnesses concerning causation and their diagnosis and treatment of her.

On November 26 the Hansens moved for leave to substitute Sandra R. Willems–Stewart, R.N., in lieu of Jane Fleming, R.N. The district court granted the motion.

On January 14, 2003, the Hansens filed what they termed a compliance with Iowa Rule of Civil Procedure 1.508 (discovery of experts). In this document they stated:

COMES NOW the Plaintiffs, Marlys Hansen and Tom Hansen, and for compliance with Iowa Rule of Civil Procedure 1.508 state[] to the Court as follows:

1. Dr. Kenneth Pollack has treated Plaintiff Marlys Hansen with regard to chronic pain management. Based on a review of the records, and his November 25, 2002 deposition, it is anticipated that Dr. Pollack may be called to testify regarding the plaintiff's medical condition, as well as causation and damage issues.

2. Based on a review of the records and her January 13, 2003 deposition, Sandra Willems–Stewart, R.N. may be called to testify regarding standards of nursing care.

On January 21 IMMC moved in limine to prevent the Hansens from using physicians as expert witnesses who were not properly designated as such. IMMC as-

serted that the Hansens were attempting to use a treating doctor to give opinions on causation. On the same day, IMMC moved to strike Dr. Pollack as an expert witness on the grounds that Dr. Pollack was not designated as an expert witness who would provide causation testimony as required by Iowa Code section 668.11. In support of its motion to strike, IMMC cited *Cox v. Jones*, 470 N.W.2d 23 (Iowa 1991).

On February 3 the Hansens filed a resistance to IMMC's motion in limine and reply in opposition to its motion to strike. They argued they were not required to designate Dr. Pollack as an expert pursuant to section 668.11 because he was a treating physician. They cited *Carson v. Webb*, 486 N.W.2d 278 (Iowa 1992), in support of their position.

On February 10, just before the jury trial was to start, the district court sustained IMMC's motion to strike Dr. Pollack's testimony on causation. It did so because the Hansens had failed to designate Dr. Pollack as an expert pursuant to section 668.11. Before the court's ruling, the Hansens argued that this court in *Carson v. Webb* had indicated that when a treating physician has formed an opinion in the course of the physician's treatment, the physician need not be designated as an expert as required by Iowa Code section 668.11. During the trial, the Hansens made an offer of proof of Dr. Pollack's testimony on causation, which the district court denied because the Hansens had failed to designate him as an expert pursuant to section 668.11.

Sandra Willems–Stewart, R.N., the Hansens' expert, testified that IMMC breached nursing standards of care. She testified that "[m]aking sure that the wheels on a bed are in the locked position would be one of an expected standard of care for a patient who is at risk for falls."

On February 14 the jury returned a verdict, finding IMMC negligent. However, the jury also found that IMMC's negligence was not a proximate cause of any damage to the Hansens.

The district court denied the Hansens' motion for new trial in which they contended that, among other things, the district court erred in excluding Dr. Pollack's testimony on causation. In denying the motion, the court reaffirmed its earlier decision to exclude Dr. Pollack's testimony, because the Hansens had failed to designate him as an expert pursuant to section 668.11. The court also noted that Dr. Pollack's testimony was insufficient on causation because he did not state his opinion in terms of "a medical degree of certainty."

The Hansens appealed; we transferred the case to the court of appeals, which affirmed.

## II. Issues.

On further review, we consider two issues. First, did the district court abuse its discretion when it excluded the testimony of a treating physician on the question of causation? Second, if so, did such denial deprive the Hansens of a fair trial thereby entitling them to a new trial?

## III. Scope of Review.

To the extent that we are required to interpret Iowa Code section 668.11, our review is for correction of errors at law. *In re Det. of Cubbage*, 671 N.W.2d 442, 444 (Iowa 2003) (review of a district court's construction and interpretation of a statute is for correction of errors at law). On the question of whether the district court properly exercised its discretion in excluding Dr. Pollack's testimony, our review is for abuse of discretion. *Bell v. Cmty. Ambulance Serv. Agency*, 579 N.W.2d 330, 338

(Iowa 1998) (review of exclusion of expert testimony is for abuse of discretion).

 Our review of rulings on motions for new trial depends on the grounds for new trial asserted in the motion and ruled upon by the district court. *Ladeburg v. Ray,* 508 N.W.2d 694, 696 (Iowa 1993). If the motion and the ruling are based on a discretionary ground, we review the ruling for abuse of discretion. *Id.* If the motion and ruling are based on a legal issue, our review is for correction of errors at law. *Id.* at 696–97. Here, the motion and ruling were based on a discretionary ground. *See* Iowa R. Civ. P. 1.1004(1). Our review is therefore for abuse of discretion.

## IV. Exclusion of the Expert Testimony.

As mentioned, the district court excluded Dr. Pollack's testimony on causation because the Hansens failed to designate him as an expert witness in accordance with Iowa Code section 668.11. In its ruling on the Hansens' motion for new trial, the court in addition found the doctor's opinion on causation to be "insufficient to be admissible" because the opinion was not "expressed to a medical degree of certainty."

**A. Iowa Code section 668.11.** This provision provides:

1. A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert within the following time period:

 *a.* The plaintiff within one hundred eighty days of the defendant's answer unless the court for good cause not ex parte extends the time of disclosure.

 *b.* The defendant within ninety days of plaintiff's certification.

2. If a party fails to disclose an expert pursuant to subsection 1 or does not make the expert available for discovery, the expert shall be prohibited from testifying in the action unless leave for the expert's testimony is given by the court for good cause shown.

3. This section does not apply to court appointed experts or to rebuttal experts called with the approval of the court.

Iowa Code § 668.11.

It is uncontroverted that the Hansens did not designate Dr. Pollack as their expert on causation within one hundred eighty days of IMMC's answer and offered no good cause to extend the time. The Hansens contend they were not required to do this because Dr. Pollack formulated all of his opinions about causation during his treatment of Marlys and not in anticipation of litigation. As such, the Hansens argue, Dr. Pollack's testimony on causation clearly falls within this court's interpretation of section 668.11 as stated in *Carson v. Webb,* 486 N.W.2d 278 (Iowa 1992).

Not surprising, IMMC contends otherwise. To support its position, IMMC relies heavily on this court's decision in *Cox v. Jones,* 470 N.W.2d 23 (Iowa 1991). In *Cox,* a medical malpractice case, the district court excluded the testimony of a treating physician on the standard of care because of the plaintiffs' failure to designate the physician as an expert within the time frame of section 668.11. 470 N.W.2d at 25. In affirming the decision, we held that a treating physician must be designated as an expert pursuant to section 668.11 if the physician is to give opinions on reasonable standards of care and *causation.* *Id.*

A year later in *Carson v. Webb,* we dispelled any notion that a treating physi-

cian's opinions on causation would automatically mean that the treating physician would have to be designated under section 668.11. 486 N.W.2d at 280–81. In that case, the district court excluded opinion evidence from treating physicians that could not be the subject of lay testimony because the plaintiff had failed to designate those physicians as expert witnesses as provided in Iowa Rule of Civil Procedure 125(c) (now 1.508) (requiring disclosure of expert witness no less than thirty days before trial; noncompliance with this provision permits district court in its discretion to exclude or limit the testimony of such witness). *Id.* at 280.

The plaintiffs contended, and we agreed, that the district court's ruling was overly restrictive. *Id.* In reaching this conclusion, we relied on *Day v. McIlrath,* 469 N.W.2d 676 (Iowa 1991) (per curiam).

In *Day,* a personal injury action filed on behalf of a minor, the defendant propounded an interrogatory to the plaintiffs, asking them to identify all expert witnesses to be called at trial and to state each expert's subject matter of testimony, qualifications, opinions, and mental impressions. 469 N.W.2d at 677. The plaintiffs objected to this interrogatory insofar as it applied to the minor plaintiff's treating physicians. *Id.* In support of their objection, the plaintiffs asserted that the testimony of a treating physician is not discoverable under rule 125 because the treating physician's mental impressions and opinions were not " 'acquired or developed in anticipation of litigation or for trial.' " *Id.* The district court disagreed and directed the plaintiffs to answer the interrogatories with regard to treating physicians, as well as other experts. *Id.* We granted the plaintiffs' application for interlocutory appeal challenging the district court order. *Id.* We reversed, first noting that rule 125 provides as follows:

"[D]iscovery of facts known, mental impressions, and opinions held by an expert whom the other party expects to call as a witness at trial, otherwise discoverable under the provisions of R.C.P. 122"a" and *acquired or developed in anticipation of litigation for trial* may be obtained [in a specified manner].

. . . .

Nothing in this rule shall be construed to preclude a witness from testifying as to (1) knowledge of the facts obtained by the witness prior to being retained as an expert or (2) mental impressions or opinions formed by the witness which are based on such knowledge."

*Id.* (quoting Iowa R. Civ. P. 125) (alterations in original).

We then interpreted this language as follows:

The question raised here is whether the factual knowledge, mental impressions and opinions of a treating physician were "acquired or developed in anticipation of litigation or for trial," thereby requiring rule 125 disclosure with regard to a treating physician. We answer this question in the negative. A treating physician ordinarily learns facts in a case, and forms mental impressions or opinions, substantially before he or she is retained as an expert witness, and often before the parties themselves anticipate litigation. We believe a treating physician ordinarily focuses, while treating a patient, on purely medical questions rather than on the sorts of partially legal questions (such as causation or percentage of disability) which may become paramount in the context of a lawsuit.

*Id.* Relying on this language from *Day,* we said in *Carson,*

Applying our observation in *Day* to the present facts, we believe that the

district court erred in concluding that plaintiff's failure to disclose her treating physicians in interrogatory answers required exclusion of all opinion evidence that could not be the subject of lay testimony. Rather, the paramount criterion is whether this evidence, irrespective of whether technically expert opinion testimony, relates to facts and opinions arrived at by a physician in treating a patient or whether it represents expert opinion testimony formulated for purposes of issues in pending or anticipated litigation.

486 N.W.2d at 280–81.

We then took the opportunity in *Carson* to point out that our view of rule 125 as explained in the above quote was not inconsistent with our interpretation of section 668.11 in *Cox. Id.* at 281. In support of this observation, we noted that the expert opinion testimony excluded in *Cox* concerned reasonable standards of medical care and causation. *Id.* Reasonable standards of medical care under the facts in *Cox* were not, we stressed, a matter for which the physician was required to formulate an opinion in treating a patient. *Id.* But more important, we also stressed that the element of causation was not even involved in *Cox. Id.* So what we said in *Cox* on causation was dictum.

Finally, in *Carson*, we had this to say about our discussion of "causation" in *Cox* and in *Day:*

We do not believe, however, that the language concerning expert opinion of "causation" in *Cox* (with respect to section 668.11) or in *Day* (with respect to rule 125) was meant in either case to establish that *all* expert opinions of treating physicians as to causation are matters for which disclosure is required under the statute or rule. Some conclusions concerning causation relate directly to the treatment of a patient and are

thus outside the scope of section 668.11 or rule 125.

*Id.* n. 3. Lest there be any question that this language is merely dictum as to cases arising under section 668.11, we adopt this reasoning for section 668.11 cases and more specifically this case.

*Carson* makes clear that disclosure under section 668.11 may be required when a treating physician gives an opinion about reasonable standards of medical care. This is because the physician ordinarily is not required to formulate such an opinion in order to treat the patient. To that extent, *Cox* is correct in stating that an opposing party should therefore be able to expect that a treating physician's testimony will not include opinions on reasonable standards of care. *Cox,* 470 N.W.2d at 25. That was the rationale in *Cox* for holding that physicians who give such opinions should be within the ambit of section 668.11. *Id.*

■ However, as *Carson* points out, that is not the case with respect to causation because some conclusions concerning causation relate directly to the treatment of a patient and for that reason are outside the scope of section 668.11. 486 N.W.2d at 281 n. 3. Therefore,

the paramount criterion is whether this evidence, irrespective of whether technically expert opinion testimony, relates to facts and opinions arrived at by a physician in treating a patient or whether it represents expert opinion testimony formulated for purposes of issues in pending or anticipated litigation.

*Id.* at 281. This "paramount criterion" was more fully explored in the context of rule 125 in *Morris–Rosdail v. Schechinger,* 576 N.W.2d 609 (Iowa Ct.App.1998).

In *Morris–Rosdail,* a personal injury action, the district court granted a defense motion to exclude testimony from two

treating doctors regarding the plaintiff's need for future surgery and permanent impairment. 576 N.W.2d at 610. The district court granted the motion because the plaintiff had failed to disclose the doctors' opinions in response to the defendant's interrogatory. *Id.* at 611. The court of appeals first noted that rule 125 distinguishes between facts and opinions of experts derived prior to being retained as experts and those acquired or developed in anticipation of litigation or for trial. *Id.* at 611–12. The court also noted that the rule does not preclude an expert from testifying to facts and opinions derived prior to being retained as an expert and for this reason treating physicians are generally not subject to rule 125. *Id.* at 612. The court then recognized, citing *Carson,* that "the threshold question [is] whether the facts and opinions were formulated by a physician in treating a patient or whether they were formulated by a physician for purposes of the issues in pending or anticipated litigation." *Id.* The court aptly noted that

[a]lthough the disclosure requirements of rule 125 are generally limited to physicians retained for purposes of litigation and exclude treating physicians, the application of the rule does not necessarily depend on the label or role of the physician. Instead, it hinges on the reason and time frame in which the underlying facts and opinions were acquired by the physician. Thus, even treating physicians may come within the parameters of rule 125 when they begin to assume a role in the litigation analogous to that of a retained expert. This generally occurs when a treating physician begins to focus less on the medical questions associated in treating the patient and more on the legal questions which surface in the context of a lawsuit.

*Id.* (citation omitted).

The court of appeals reversed the district court decision excluding the physicians' testimony because the record showed both experts were treating physicians and there was no evidence that their opinion testimony was subsequently acquired or developed in anticipation of trial. *Id.* In short, "[t]here was a lack of substantial evidence to support a finding the excluded opinions were within the scope of rule 125." *Id.*

According to Dr. Pollack's deposition testimony, he first treated Marlys in 1995 for lower extremity pain after back surgery by another physician. Eventually, he ordered a surgical procedure in which a vascular surgeon removed the sympathetic nerve chain in the low back. This procedure was partially successful in relieving her pain. Thereafter in November 1998, he performed a procedure to destroy nerve fibers carrying pain messages from the joints in the low back. Later, he implanted a device in her back to interfere with the pain messages.

Dr. Pollack recalled that Marlys told him about her June 1999 fall at IMMC and that she thereafter had significant increases in pain and discomfort which limited her ability to function. Her pain level was severe enough that she would consider just about anything that might help. To address this pain, Dr. Pollack tried several procedures to alleviate it, including increasing her dosages of pain medications. The medications were not sufficient to address her pain, so in September 1999 Dr. Pollack installed a pump in her back to deliver morphine to treat the pain.

■ All of the foregoing deposition testimony is in the record. The following portion of Dr. Pollack's deposition testimony was the subject of an offer of proof by the Hansens, which the district court refused to admit into evidence:

Q. Based on the history of a fall in June of 1999 as Marlys Hansen reported it to you and as she reported to you the significant increase in pain and discomfort thereafter, do you form any conclusions as one of her treaters as to whether that increase in pain and discomfort was causally correlated with the fall she reported to you?

. . . .

A. The time sequence suggests that there was some correlation between the events that occurred and her subsequent increased pain.

Q. Why is the timing significant?

. . . .

A. When people have had previous lumbar spine surgery, they often have a lot of scar tissue which can cause nerve irritation or nerve entrapment. I frequently see people who have been doing very well for some number of months or years after they have had back surgery and then a specific event occurs like a fall or an automobile accident which rapidly causes onset of increased leg pain or new leg pain.

So the timing becomes very important if you're trying to establish a cause and effect relationship. Had the pain increased three months or six months or a year after a fall, it would be very hard for me to draw a conclusion that there is potentially a cause and effect relationship.

But if it were a matter of hours or days or even a week or two, it becomes much more likely that there was a cause and effect relationship.

Q. And based on the history then as Marlys reported it to you of a fall and pain of a significantly increased level shortly thereafter, does that make it more likely than not that there's some causal connection between the fall and the increase in pain?

A. I think again that the history suggests a probability that there is some causal relationship between the incident she described and the pain increase, and I partially base that on the fact that there's documentation of a significant increase of pain within a fairly short time after that fall.

Now, I would like it to be clear that she did not talk to me about her increased symptoms as it relates to the fall at that time. It was not until much later.

From the foregoing deposition testimony, it is clear that Dr. Pollack was Marlys's treating physician long before the fall at IMMC and after the fall. It is also clear from the offer of proof that he formed his causation opinion as a *treater*. Moreover, there is no record evidence that Dr. Pollack's causation opinion was formulated as a retained expert for purposes of issues in pending or anticipated litigation.

Dr. Pollack treated Marlys for the increased pain following the fall in question with various procedures and increased medication. Therefore, his causation opinion directly related to his treatment. Because Dr. Pollack was treating Marlys for this increased pain, it is only reasonable that the jury should hear what the doctor thought was the cause of that increased pain.

For all these reasons, we agree with Marlys that Dr. Pollack's causation opinion was not within the ambit of section 668.11. The district court therefore abused its discretion in not admitting the offer of proof on that ground.

That brings us to the related issue.

**B. Medical testimony insufficient on causation.** As mentioned, the district court in its ruling on the motion for new trial gave an additional reason for exclud-

ing Dr. Pollack's opinion testimony on causation: the testimony was "insufficient to be admissible" because the opinion was not "expressed to a medical degree of certainty." We disagree.

■ The rule is that expert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a question on causation. *Winter v. Honeggers' & Co.*, 215 N.W.2d 316, 323 (Iowa 1974). Buzzwords like "reasonable degree of medical certainty" are therefore not necessary to generate a jury question on causation. In the offer of proof on causation, Dr. Pollack's deposition testimony was as follows:

> [T]he history suggests a probability that there is some causal relationship between the incident she described and the pain increase, and I partially base that on the fact that there's documentation of a significant increase of pain within a fairly short time after the fall.

This was sufficient to generate a jury question on causation.

## V. New Trial.

The Hansens' motion for new trial was based in part on the exclusion of Dr. Pollack's deposition testimony on causation. The relevant rule provision states:

> On motion, the aggrieved party may have an adverse verdict, decision, or report or some portion thereof vacated and a new trial granted if any of the following causes materially affected movant's substantial rights:
>
> 1.1004(1) ... any order of the court ... or abuse of discretion which pre-

vented the movant from having a fair trial.

Iowa R. Civ. P. 1.1004(1).

■ Clearly, the exclusion of Dr. Pollack's testimony on causation materially affected the Hansens' rights in light of the fact that his was the only medical testimony on this issue and the jury found IMMC negligent but its negligence was not a proximate cause of the Hansens' damages. The district court's exclusion of this testimony was an abuse of discretion, which denied the Hansens a fair trial. The district court therefore abused its discretion in denying them a new trial.

## VI. Disposition.

Because we conclude the district court abused its discretion in excluding Dr. Pollack's deposition testimony on causation and in denying the Hansens' motion for a new trial, we reverse and remand the case for a new trial.

We have carefully considered all of the issues raised. Those we have not addressed either lack merit or were not properly preserved.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except LARSON and TERNUS, JJ., who take no part.